# EXHIBIT 1

# Sale of Goods Agreement

This Sale of Goods Agreement, dated as of this 16th day of June, 2021 (this "**Agreement**"), is entered into between NATIONAL SALVAGE & SERVICE CORPORATION, an Indiana corporation ("**Seller**"), and SULA VALLEY BIOGAS, SA de C.V., a Honduran corporation and related company of HONDURAN GREEN POWER CORPORATION ("**Buyer**," and together with Seller, the "**Parties**," and each, a "**Party**").

WHEREAS, Seller is in the business of selling mulched railroad ties for fuel;

WHEREAS, Buyer is in the business of designing, manufacturing, and marketing clothing and active wear, and also owning and operating a power generation facility in Honduras; and

WHEREAS, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer the Goods.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. <u>Sale of Goods</u>. Seller shall sell to Buyer and Buyer shall purchase from Seller the goods set forth on Exhibit A (the "**Goods**") in the quantities and at the Prices (as defined in Section 9) and upon the terms and conditions set forth in this Agreement.

2. <u>Terms of Agreement Prevail Over Buyer's Purchase Order</u>. This Agreement is expressly limited to the terms of this Agreement and the Basic Purchase Order Terms ((a) a list of the Goods to be purchased; (b) the quantity of each of the Goods ordered; (c) the requested delivery date; (d) the unit Price for each of the Goods to be purchased; (e) the billing address; and (f) the Delivery Location contained in any applicable Purchase Order. The terms of this Agreement prevail over any terms or conditions contained in any other documentation and expressly exclude any of Buyer's general terms and conditions contained in any Purchase Order or other document issued by Buyer. In the event of any conflict between the terms of this Agreement and the terms of any Purchase Order or any other document issued by Buyer, the terms of this Agreement prevail.

3. <u>Purchase Orders.</u> If any Purchase Order is required by either Party to be issued as part of this Agreement, Buyer shall initiate all Purchase Orders in written form via facsimile, e-mail, or US mail, and cause all Purchase Orders to contain the Basic Purchase Order Terms. By placing a Purchase Order, Buyer makes an offer to purchase the Goods pursuant to the terms and conditions of this Agreement, including the Basic Purchase Order Terms, and on no other terms. Except with respect to the Basic Purchase Order Terms, any variations made to the terms and conditions of this Agreement by Buyer in any Purchase Order are void and have no effect.

4. <u>Delivery</u>.

   (a) The Goods will be delivered within a reasonable time (but no later than thirty (30) days) after the execution of this Agreement or receipt of a Purchase Order. Seller shall not be liable for any delays, loss or damage in transit.

(b) Seller shall deliver the Goods to the Port of Cortes, Honduras (the "**Delivery Point**") using Seller's standard methods for packaging and shipping such Goods. Buyer shall take delivery of the Goods within no more than ten (10) days of Seller's written notice that the Goods have been delivered to the Delivery Point. All Prices are Cost & Freight (CFR), Delivery Point, Incoterms® 2020.

(c) Each shipment will constitute a separate sale with the use of a Purchase Order from Buyer, if necessary, and Buyer shall pay for the units shipped whether such shipment is in whole or partial fulfillment of the quantity purchased under this Agreement.

(d) If for any reason Buyer fails to accept delivery of any of the Goods on the date fixed pursuant to Seller's notice that the Goods have been delivered at the Delivery Point, or if Seller is unable to deliver the Goods at the Delivery Point on such date because Buyer has not provided appropriate instructions, documents, licenses or authorizations: (i) risk of loss to the Goods shall pass to Buyer; (ii) the Goods shall be deemed to have been delivered; and (iii) Seller, at its option, may store the Goods until Buyer picks them up, whereupon Buyer shall be liable for all related costs and expenses (including, without limitation, storage and insurance).

(e) Seller shall:

   (i) be responsible for export clearance;

   (ii) arrange the contract of carriage; and

   (iii) bear the costs of delivery of the Goods to the Delivery Point.

(f) Buyer shall:

   (i) bear the unloading and terminal handling charges at the Delivery Point;

   (ii) bear the costs of carriage from the Delivery Point to the Buyer's premises; and

   (iii) be responsible for import clearance.

5. Non-Delivery. The quantity of any installment of Goods as recorded by Seller on dispatch from Seller's place of business is conclusive evidence of the quantity received by Buyer on delivery unless Buyer can provide conclusive evidence proving the contrary. Seller shall not be liable for any non-delivery of Goods (even if caused by Seller's negligence) unless Buyer gives written notice to Seller of the non-delivery within ten (10) days of the date when the Goods would in the ordinary course of events have been received. Any liability of Seller for non-delivery of the Goods shall be limited to delivering the Goods within a reasonable time or adjusting the invoice respecting such Goods to reflect the actual quantity delivered.

6.  Quantity. Seller shall employ, at its expense, an Accredited Marine Surveyor (AMS®) or equivalent accredited surveyor, engaged in performing surveys of the loading, unloading, inspection, and shipment of cargo to determine the actual weight of the quantity of Goods set forth in Exhibit A. The determination of weight by said Accredited Marine Surveyor (AMS®) or equivalent accredited surveyor shall govern any and all disputes between the Parties on the quantity of Goods bought and sold under this Agreement and related Purchase Orders. If Seller delivers to Buyer a quantity of Goods of up to ten percent (10%) more or less than the quantity set forth on Exhibit A, Buyer shall not be entitled to object to or reject the Goods or any portion of them by reason of the surplus or shortfall and shall pay for such Goods the price set forth in this Agreement adjusted pro-rata.

7.  Title and Risk of Loss. Title passes to Buyer upon delivery of the Goods on board the ship at the Port of Morehead City, NC (" **Port of Shipment**"). Seller bears the risk of loss of or damage to the Goods until delivery of the Goods on board the ship at the Port of Shipment. Buyer bears all risks of loss or damage to the Goods from the delivery of the Goods onto the ship at the Port of Shipment onward.

8.  Inspection and Rejection of Nonconforming Goods.

(a)  Buyer shall inspect the Goods at Seller's facility in Dudley, North Carolina prior to delivery of the Goods to the Port of Shipment, or upon Buyer's receipt of the Goods at the Port of Shipment ("**Inspection Period**"). Buyer will be deemed to have accepted the Goods unless it notifies Seller in writing of any Nonconforming Goods during the Inspection Period and furnishes such written evidence or other documentation as reasonably required by Seller. "**Nonconforming Goods**" means only the following: (i) product shipped is different than identified in this Agreement; or (ii) the product's label or packaging incorrectly identifies its contents.

(b)  The Accredited Marine Surveyor (AMS®) or equivalent accredited surveyor accepted by Buyer shall perform moisture tests upon receipt of the Goods at the Port of Shipment. Goods shall not exceed a twenty-eight percent (28%) moisture level. If the Goods exceed the acceptable moisture level, the price of the Goods shall be set in accordance with the pricing table in Exhibit B.

(c)  If Buyer timely notifies Seller of any Nonconforming Goods, Seller shall, in its sole discretion, (i) replace such Nonconforming Goods with conforming Goods, or (ii) credit or refund the Price for such Nonconforming Goods. Buyer shall ship, at Seller's expense and risk of loss, the Nonconforming Goods to Seller's facility located at direction and instruction of Seller. If Seller exercises its option to replace Nonconforming Goods, Seller shall, after receiving Buyer's shipment of Nonconforming Goods, ship to Buyer, at Seller's expense and risk of loss, the replaced Goods to the Delivery Point.

(d)  Buyer acknowledges and agrees that the remedies set forth in Section 8(c)8(b) are Buyer's exclusive remedies for the delivery of Nonconforming Goods. Except as provided under Section 8(c)8(b), all sales of Goods to Buyer are made on a one-way basis and Buyer has no right to return Goods purchased under this Agreement to Seller.

9. Price. Buyer shall purchase the Goods from Seller at the prices (the "**Prices**") set forth in Exhibit A; or as set forth in Exhibit B, if the moisture content exceeds the acceptable moisture level as outlined in section 8(b). All Prices are exclusive of all sales, use and excise taxes, and any other similar taxes, duties and charges of any kind imposed by any governmental authority on any amounts payable by Buyer. Buyer shall be responsible for all such charges, costs, and taxes; provided, that, Buyer shall not be responsible for any taxes imposed on, or with respect to, Seller's income, revenues, gross receipts, personnel or real or personal property or other assets.

10. Payment Terms. Buyer shall pay eighty percent (80%) of the invoiced amounts due to Seller within two (2) days from the completed and documented loading date of Goods at the Port of Shipment. Buyer shall make all payments hereunder by wire transfer or check and in US dollars upon receipt of invoice, Bill of Lading, and third-party certificate. Buyer shall pay the remaining twenty percent (20%) of the invoiced amounts within thirty (30) days from the completed and documented unloading date of Goods at the Delivery Point. Buyer shall reimburse Seller for all costs incurred in collecting any late payments, including, without limitation, reasonable attorneys' fees.

11. Exclusivity.

(a) Except for the specific and limited requirements in (b), Buyer shall purchase exclusively from Seller all creosote-treated wood fuel that originates from the United States, Canada, or Mexico for the duration of this Agreement and an additional three (3) years from the expiration or termination date of this Agreement.

(b) Buyer may purchase creosote-treated wood from an entity other than Seller if:

(i) the creosote-treated wood originates from New York, Connecticut, or New Jersey; and

(ii) the creosote-treated wood is shipped from a port located in New York, Connecticut, or New Jersey.

12. No Setoff. Buyer shall not, and acknowledges that it will have no right, under this Agreement, any other agreement, document or law, to withhold, offset, recoup or debit any amounts owed (or to become due and owing ) to Seller or any of its affiliates, whether under this Agreement or otherwise, against any other amount owed (or to become due and owing) to it by Seller or its affiliates, whether relating to Seller's or its affiliates' breach or non-performance of this Agreement or any other agreement between Buyer or any of its affiliates, and Seller or any of its affiliates, or otherwise.

13. Warranties. **SELLER MAKES NO WARRANTY WHATSOEVER WITH RESPECT TO THE GOODS, INCLUDING ANY (a) WARRANTY OF MERCHANTABILITY; (b) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; OR (c) WARRANTY OF TITLE; WHETHER EXPRESS OR IMPLIED BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE OR OTHERWISE.**

14. Limitation of Liability.

(a) IN NO EVENT SHALL SELLER OR BUYER BE LIABLE FOR ANY CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF, OR RELATING TO, AND/OR IN CONNECTION WITH ANY BREACH OF THIS AGREEMENT, REGARDLESS OF (A) WHETHER SUCH DAMAGES WERE FORESEEABLE, (B) WHETHER OR NOT SELLER WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, (C) THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) UPON WHICH THE CLAIM IS BASED, AND (D) THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE.

(b) WITH THE EXCEPTION OF INDEMNITY OBLIGATIONS, IN NO EVENT SHALL SELLER'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, EXCEED THE TOTAL OF THE AMOUNTS PAID TO SELLER FOR THE GOODS SOLD HEREUNDER.

15. Compliance with Law. The parties are in compliance with and shall comply with all applicable laws, regulations, and ordinances. The parties have and shall maintain in effect all the licenses, permissions, authorizations, consents and permits that each needs to carry out its obligations under this Agreement.

16. Indemnification. Each Party (as "**Indemnifying Party**") shall indemnify, hold harmless, and defend the other Party and its successors and permitted assigns (collectively, "**Indemnified Party**") against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees, that are incurred by Indemnified Party (collectively, "**Losses**"), relating to any claim of a third party or the Indemnified Party arising out of or occurring in connection with the Goods or the Indemnifying Party's negligence, willful misconduct, or material breach of this Agreement. The Indemnifying Party shall not enter into any settlement without the Indemnified Party's prior written consent.

17. Insurance. During the term of this Agreement, Buyer shall, at its own expense, procure and maintain insurance coverage in respect to the Goods from loading at the Port of Shipment through to discharge and unloading at the Delivery Point for the full Cost of Goods, Insurance, and Freight (CIF) value calculated in accordance with the terms of this contract against full risks with financially sound and reputable insurers. Upon Seller's request, Buyer shall provide Seller with a certificate of insurance from Buyer's insurer evidencing the insurance coverage specified in this Agreement. The certificate of insurance shall name Seller as a lost payee corresponding for twenty percent (20%) of the total amount of value of this Agreement. .

18. Termination. In addition to any remedies that may be provided in this Agreement, Seller may terminate this Agreement with immediate effect upon written notice to Buyer, if

Buyer: (i) fails to pay any amount when due under this Agreement and such failure continues for ten (10) days after Buyer's receipt of written notice of nonpayment; (ii) has not otherwise performed or complied with any of the terms of this Agreement, in whole or in part; or (iii) becomes insolvent, files a petition for bankruptcy or commences or has commenced against it proceedings relating to bankruptcy, receivership, reorganization or assignment for the benefit of creditors.

19. Confidential Information. All non-public, confidential or proprietary information of Seller, including, but not limited to, specifications, samples, patterns, designs, plans, drawings, documents, data, business operations, customer lists, pricing, discounts or rebates, disclosed by Seller to Buyer, whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential," in connection with this Agreement is confidential, solely for the use of performing this Agreement and may not be disclosed or copied unless authorized by Seller in writing. Upon Seller's request, Buyer shall promptly return all documents and other materials received from Seller. Seller shall be entitled to injunctive relief for any violation of this Section. This Section shall not apply to information that is: (a) in the public domain; (b) known to the Buyer at the time of disclosure; or (c) rightfully obtained by the Buyer on a non-confidential basis from a third party. If a party is required in a judicial proceeding or pursuant to administrative process to disclose any confidential information, then such party will use all reasonable efforts to promptly notify the other party so that the other party may seek any appropriate protective order and/or take any other action to prevent or limit such disclosure. The parties acknowledge and agree that damages for breach or threatened breach of the obligations herein will be difficult to ascertain and such breach will result in immediate and irreparable harm to the non-breaching party for which it may have no adequate remedy at law and for which monetary damages will not be adequate. In the event one party breaches its obligations hereunder, in addition to any other rights or remedies the non-breaching party may have at law or in equity, the non-breaching party shall be entitled to immediate equitable relief, including temporary and permanent injunctive relief and specific performance.

20. Entire Agreement. This Agreement, including all related exhibits, schedules, attachments and appendices, together with any Purchase Orders, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

21. Survival. Subject to the limitations and other provisions of this Agreement: (a) the representations and warranties of the Parties contained herein shall survive the expiration or earlier termination of this Agreement; and (b) Section 11, Section 16, Section 19, and Section 21 of this Agreement, as well as any other provision that, in order to give proper effect to its intent, should survive such expiration or termination, shall survive the expiration or earlier termination of this Agreement. All other provisions of this Agreement shall not survive the expiration or earlier termination of this Agreement.

22. Notices. All notices, requests, consents, claims, demands, waivers and other communications under this Agreement must be in writing and addressed to the other Party at its address set forth below (or to such other address that the receiving Party may designate from

time to time in accordance with this Section). Unless otherwise agreed herein, all notices must be delivered by personal delivery, nationally recognized overnight courier or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a notice is effective only (a) on receipt by the receiving Party, and (b) if the Party giving the Notice has complied with the requirements of this Section.

| | |
|---|---|
| Notice to Seller: | 6755 South Old State Road 37<br>Bloomington, IN 47401 |
| | Attention: President |
| Notice to Buyer: | Zona Libre Zip Choloma, Carretera La Jutosa, Choloma, Cortes |
| | Attention: President |

23. <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon a determination that any term or provision is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement to effect the original intent of the Parties as closely as possible in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

24. <u>Amendments</u>. No amendment to or modification of or rescission, termination or discharge of this Agreement is effective unless it is in writing, identified as an amendment to or rescission, termination or discharge of this Agreement and signed by an authorized representative of each Party.

25. <u>Waiver</u>. No waiver by any party of any of the provisions of this Agreement shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

26. <u>Cumulative Remedies</u>. All rights and remedies provided in this Agreement are cumulative and not exclusive, and the exercise by either Party of any right or remedy does not preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, in any other agreement between the Parties or otherwise. Notwithstanding the previous sentence, the Parties intend that Buyer's rights under Section 5 and Section 8 are Buyer's exclusive remedies for the events specified therein.

27. <u>Assignment</u>. Buyer shall not assign, transfer, delegate or subcontract any of its rights or obligations under this Agreement without the prior written consent of Seller. Any purported assignment, transfer, delegation or subcontract in violation of this Section shall be null and void. No assignment, transfer, delegation or subcontract shall relieve Buyer of any of its

obligations hereunder. Seller may at any time assign, transfer, delegate or subcontract any or all of its rights or obligations under this Agreement without Buyer's prior written consent.

28. Successors and Assigns. This Agreement is binding on and inures to the benefit of the Parties to this Agreement and their respective permitted successors and permitted assigns.

29. No Third-Party Beneficiaries. This Agreement benefits solely the Parties to this Agreement and their respective permitted successors and assigns and nothing in this Agreement, express or implied, confers on any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

30. Choice of Law. This Agreement, including all exhibits, schedules, attachments and appendices attached to this Agreement and thereto, and all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the laws of the State of Delaware, United States of America, without regard to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware.

31. OFAC Representation and Warranty. The parties are in compliance with the International Emergency Economic Powers Act (50 U.S.C. § 1701) and all other Laws administered by OFAC or any other Governmental Authority imposing economic sanctions and trade embargoes ("**Economic Sanctions Laws**") against countries ("**Embargoed Countries**") and Persons designated in such Laws (collectively, "**Embargoed Targets**"). Buyer is not an Embargoed Target or otherwise subject to any Economic Sanctions Law.

32. OFAC Covenant. Without limiting the generality of Section 31, the parties shall comply with all Economic Sanctions Laws. Without limiting the generality of the foregoing, the parties shall not:

(a) directly or indirectly export, re-export, transship, or otherwise deliver the Goods or any portion of the Goods to an Embargoed Target; or

(b) broker, finance, or otherwise facilitate any transaction in violation of any Economic Sanctions Law.

33. Antiboycott Laws Covenant. Without limiting the generality of Section 31, the parties shall:

(a) comply with all Antiboycott Laws;

(b) not take any action that violates the Antiboycott Laws; and

(c) without limiting the generality of the foregoing, not, in connection with or relating in any way to this Agreement:

(i) refuse, or agree to refuse, to do business with Israel or any other nation or company subject to a boycott not endorsed by the United States;

(ii)     discriminate against, or agree to discriminate against, any Person on the basis of race, religion, sex, national origin, or nationality;

(iii)    furnish, or agree to furnish, information about the race, religion, sex, national origin, or nationality of another Person;

(iv)    furnish, or agree to furnish, information about business relationships with or in Israel or any other nation or company subject to a boycott not endorsed by the United States; or

(v)     implement letters of credit containing terms or conditions prohibited by the Antiboycott Laws.

34.     Export Regulation (EAR and ITAR) Covenant. Buyer acknowledges that the Goods, including any software, documentation and any related technical data included with, or contained in, such Goods, and any products utilizing any such Goods, software, documentation, or technical data (collectively, "**Regulated Goods**") may be subject to US export control Laws and regulations, including the Export Administration Regulations for which the Export Control Reform Act of 2018 provides permanent statutory authority, and the International Traffic in Arms Regulations administered by the US Department of State. Without limiting the generality of Section 31, Buyer shall not, and shall not permit any third parties to, directly or indirectly, export, re-export, or release any Regulated Goods to any jurisdiction or country to which, or any party to whom, the export, re-export or release of any Regulated Goods is prohibited by applicable federal or foreign Law. Buyer shall be responsible for any breach of this Section by its, and its successors' and permitted assigns', parent, Affiliates, employees, officers, directors, customers, agents, distributors, resellers, or vendors that are not Buyer or Buyer's Representatives. Without limiting the generality of Section 31, Buyer shall comply with all applicable federal and foreign Laws, and complete all required undertakings (including obtaining any necessary export license or other governmental approval), prior to exporting, re-exporting or releasing any Regulated Goods. Buyer shall provide prior written Notice of the need to comply with such Laws to any Person, firm, or entity which it has reason to believe is obtaining any such Regulated Goods from the Buyer with the intent to export.

35.     Foreign Corrupt Practices Act Representation and Warranty. The parties and their Representatives are in compliance with the Foreign Corrupt Practices Act of 1977, as amended ("**FCPA**"). Neither party, nor any of their Representatives has:

(a)    used any corporate funds for any unlawful contribution, gift, entertainment, or other unlawful expense relating to political activity or to influence official action;

(b)    made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds;

(c)    made any bribe, rebate, payoff, influence payment, kickback, or other unlawful payment; or

(d)     failed to disclose fully any contribution or payment made by Buyer (or made by any Person acting on its behalf of which Buyer is aware) that violates the FCPA.

36.     Foreign Corrupt Practices Act Covenant. Without limiting the generality of Section 31, the parties shall, and shall cause their Representatives to, comply with the FCPA, including maintaining and complying with all policies and procedures to ensure compliance with the FCPA.

37.     Choice of Forum. Each Party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever against the other Party in any way arising from or relating to this Agreement, including all exhibits, schedules, attachments and appendices attached to this Agreement, and all contemplated transactions, including contract, equity, tort, fraud, and statutory claims, in any forum other than U.S. District Court, District of Delaware or, if such court does not have subject matter jurisdiction, the courts of the State of Delaware sitting in New Castle County, and any appellate court from any thereof. Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to bring any such action, litigation or proceeding only in U.S. District Court, District of Delaware or, if such court does not have subject matter jurisdiction, the courts of the State of Delaware sitting in New Castle County. Each Party agrees that a final judgment in any such action, litigation or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

38.     Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement. Notwithstanding anything to the contrary in Section 20, a signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

39.     Force Majeure.

(a)     Neither Party shall be liable or responsible to the other Party, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement (except for any obligations of the Buyer to make payments to Seller), when and to the extent such failure or delay is caused by or results from acts beyond the reasonable control of the impacted Party ("Impacted Party"), including, without limitation, the following force majeure events ("Force Majeure Event(s)"): ((1) acts of God; ((2) flood, fire, earthquake, epidemics, pandemics, or explosion; ((3) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot or other civil unrest; ((4) government order, law, or actions; ((5) embargoes or blockades in effect on or after the date of this Agreement; ((6) national or regional emergency; and ((7) other events beyond the reasonable control of the Impacted Party.

(b)     The Impacted Party shall give notice to the other Party, within ten (10) days of the Force Majeure Event, stating the period of time the occurrence is expected to continue. The Impacted Party shall use diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. The Impacted Party shall

resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. In the event that the Impacted Party's failure or delay remains uncured for a period of ten (10) consecutive days following written notice given by it under this Section, either Party may thereafter terminate this Agreement upon ten (10) days' written notice.

    40.    <u>Relationship of the Parties</u>. The relationship between the parties is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, franchise, business opportunity, joint venture or other form of joint enterprise, employment or fiduciary relationship between the parties, and neither party shall have authority to contract for or bind the other party in any manner whatsoever. No relationship of exclusivity shall be construed from this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

NATIONAL SALVAGE & SERVICE CORPORATION

By _____

Name: Victoria Schopp

Title: President

SULA VALLEY BIOGAS, SA de C.V.

By _____

Name:

Title:

## EXHIBIT A

## DESCRIPTION OF GOODS, PRICES, QUANTITY, DELIVERY LOCATION, AND SHIPPING TERMS

- DESCRIPTION OF GOODS: Railroad tie fuel, described as creosote-treated wood chips delivered in bulk (loose) with a maximum moisture content of twenty-eight percent (28%) and an acceptable moisture level range of twenty percent (20%) to twenty-eight percent (28%). For pricing of railroad tie fuel with a moisture content above twenty-eight percent (28%), see Exhibit B.

  Railroad tie fuel shall be delivered in bulk, chipped, or mulched, and free of any material component of plastic, stones, soil, metal, glass, clay, or other foreign material.

- PRICES:   $65.00 USD per metric ton for Goods within acceptable moisture content range of twenty (20%) and twenty-eight percent (28%).

- QUANTITY:   twenty thousand (20,000) metric tons

- DELIVERY LOCATION: Port of Cortes, Honduras

- PORT OF SHIPMENT: Port of Morehead City, North Carolina

- SHIPPING TERMS:   CFR Delivery Point, Incoterms® 2020

# EXHIBIT B

## PRICING OF GOODS: MOISTURE LEVEL CONTENT

| Moisture Content (%) | Price (USD) |
|---|---|
| 20.0% to 28.0% | $65.00 |
| 29.0% | $62.76 |
| 30.0% | $60.67 |
| 31.0% | $58.71 |
| 32.0% | $56.88 |
| 33.0% | $55.15 |
| 34.0% | $53.53 |
| 35.0% | $52.00 |